**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| TRAVIS HREHA, | CASE NO. 1:22-cv-00049 |
| Plaintiff, | |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | |

Plaintiff Travis Hreha ("Plaintiff" or "Mr. Hreha") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying his application for Disability Insurance Benefits ("DIB").  (ECF Doc. 1.)  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned pursuant to the

consent of the parties. (ECF Doc. 8.)   For the reasons explained herein, the Court **AFFIRMS** the

Commissioner's decision.

## I.    Procedural History

On June 25, 2019, Mr. Hreha filed the DIB application that is the subject of the present

appeal, alleging a disability onset date of June 9, 2015.[1]  (Tr. 13, 160-67.)  He asserted disability

due to left ankle fracture/shatter and blown disc in his back.  (Tr. 79, 98, 103, 187.)  His

application was denied at the initial level (Tr. 95-99) and upon reconsideration (Tr. 100-04).  He

---

[1] Mr. Hreha was found disabled for a closed period from June 8, 2015 through July 22, 2016 in a decision dated
April 13, 2018.  (Tr. 66-77.)  He acknowledged in that prior proceeding that his disability ended on July 22, 2016
because he returned to full-time work on July 23, 2016 with no significant limitations.  (Tr. 76.)

then requested a hearing.  (Tr. 105.)  On November 23, 2020, a hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 29-65.)

The ALJ issued an unfavorable decision on January 13, 2021, finding Mr. Hreha had not been under a disability from June 9, 2015 through the date of the decision.  (Tr. 10-28.)  Plaintiff requested review of the decision by the Appeals Council.  (Tr. 157-59.)  On November 18, 2021, the Appeals Council denied his request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)

## II.      Evidence

### A.      Personal, Educational, and Vocational Evidence

Mr. Hreha was born in 1983.  (Tr. 22.)  He was thirty-two years old on the alleged disability onset date.  (*Id*.)  He has a high school education, with past work as a truck driver, material handler, and forklift operator.  (Tr. 22, 40-47, 61.)

### B.      Medical Evidence

#### 1.      Treatment History

Mr. Hreha injured his left ankle at work in 2015, requiring surgery and a subsequent course of physical therapy through 2016.  (ECF Doc. 6, p. 3 (citing Tr. 265); ECF Doc. 9, p. 3 (citing Tr. 249, 656).)  He was able to return to work in July 2016.  (Tr. 76.)

The relevant records then resume when Mr. Hreha presented to Ashley Major MSN, CNP at Allied Health and Chiropractic ("Allied") on March 19, 2018, complaining of left ankle pain status post a 2015 work-related injury.  (Tr. 507-08.)  He reported constant pain in his left ankle and left hip pain that had developed over time due to limping.  (Tr. 507.)  He reported that he had tried physical and aquatic therapy.  (*Id*.)  He also reported prior participation in vocational rehabilitation in 2016 or 2017 for two weeks, but said he had to discontinue it because he

developed a blood clot.  (*Id.*; *see also* Tr. 57.)  He was on a blood thinner for about six months.

(*Id.*)  He reported some burning sensation in his left knee that had not resolved since his DVT

diagnosis and use of a blood thinner.  (Tr. 508.)  On examination of the left ankle, his strength

was 2/5 with severely limited range of motion and tenderness to palpation.  (Tr. 507-08.)  His

right ankle demonstrated full strength.  (Tr. 507.)  He had an antalgic gait favoring his right side

with use of a cane.  (Tr. 508.)  CNP Major recommended orthopedic and vascular consultation,

activity as tolerated, and over-the-counter analgesics as needed.  (*Id.*)  Mr. Hreha continued to

follow up with Allied regarding his work-related injury through the end of 2018.  (Tr. 509-20.)

Allied placed him "off work" through June 19, 2018 for purposes of workers compensation.  (Tr.

508, 510.)  Physical therapy was recommended in August 2018.  (Tr. 512, 513, 515.)  He was

approved for light duty work in August 2018 (Tr. 512, 514, 516), but reported to Allied on

November 9, 2018 that there were no light duty options available for him at work, so he was

placed "off work" through February 9, 2019 (Tr. 518).

Mr. Hreha presented to Kelli Buckner, D.O. on November 1, 2018 at Bowtie Medical,

complaining of left hip and lower back pain.  (Tr. 265.)  He reported that his hip started to hurt

about one month earlier during a physical therapy session for his ankle.  (*Id.*)  He reported that

his lower back and left hip were sore and aching, he had sharp pain if he moved in a certain

manner, his pain radiated down his leg, and he had numbness and tingling in his upper thigh and

into his mid-shin area.  (*Id.*)  On examination, he demonstrated a positive straight leg raise on

the left, diminished sensitivity to light touch in the L4/L5 dermatome on the left, decreased

Achilles reflex on the left, and decreased (4/5) strength in the left great toe and left ankle.  (*Id.*)

His gait was antalgic, and he needed assistance to lay supine and to return to a seated position.

(*Id.*)  Dr. Buckner diagnosed low back pain, radiculopathy in the lumbar region, and segmental

and somatic dysfunction in the lumbar, sacral, and pelvic region and in the lower extremity.  (Tr. 265-66.)  She prescribed naproxen, ordered a lumbar spine MRI, and performed osteopathic manipulative therapy ("OMT").  (Tr. 266.)  She also recommended using ice and heat.  (*Id*.)

Mr. Hreha returned to Dr. Buckner on November 6, 2018.  (Tr. 267.)  He reported some improvement in his symptoms with no worsening following the treatment.  (*Id*.)  He also reported that naproxen was helping but he could tell when it was starting to wear off.  (*Id*.)  His pain was keeping him from sleeping at times.  (*Id*.)  Dr. Buckner noted that his mobility was improved since his prior visit; he was "able to maneuver to supine/seated position unassisted with improved fluidity."  (*Id*.)  Dr. Buckner added Tylenol 1000 mg to be used at bedtime or if he woke up in the night, and recommended that he continue using naproxen, ice and heat, and exercises as tolerated.  (*Id*.)  She also provided him with pelvic stabilization exercises and performed OMT.  (*Id*.)

During an appointment with Kimberly Dahodwala MSN, APRN-CNP at Allied on November 9, 2018, Mr. Hreha continued to report pain in his left ankle, left hip, and low back. (Tr. 517.)  He also reported daily swelling in his left ankle.  (*Id*.)  On examination, straight leg raise was positive on the left and negative on the right.  (*Id*.)  He also demonstrated tenderness to palpation in the left hip and left lumbar spine, pain with range of motion, decreased sensation, and tenderness to palpation over the hardware in the left ankle.  (*Id*.)  His gait was antalgic with use of a cane.  (*Id*.)  CNP Dahodwala recommended that he continue with physical therapy and use of naproxen.  (*Id*.)

When Mr. Hreha returned to Dr. Bucker on November 13, 2018, he reported that he was moving around a little better, but he still had shooting pain from his lower back.  (Tr. 269.)  He reported that he had not taken naproxen that day because it was upsetting his stomach.  (*Id*.)  He

4

told Dr. Bucker that the physical therapist for his ankle indicated his claim could be amended to include his back pain as an aggravation of his ankle injury. (*Id*.) On examination, his gait was antalgic. (*Id*.) Dr. Buckner performed OMT. (*Id*.) She recommended that he start physical therapy for his lumbar spine, noting she agreed that "his current symptoms [were] likely related to some degree to his chronic/permanent gait alteration due to his ankle injury/surgery." (*Id*.)

Physical therapy for the lumbar spine was approved and he attended an evaluation on November 19, 2018. (Tr. 271.) When he saw Dr. Buckner the following day, he reported that he was "very sore after the evaluation yesterday." (*Id*.) His gait was antalgic on examination. (*Id*.) Dr. Buckner performed OMT and advised him to follow up in two weeks. (*Id*.)

Mr. Hreha had a lumbar spine MRI on November 26, 2018. (Tr. 250-51.) The impression was: "Disc extrusion at L4-5, disc protrusion at L5-S1" and "[m]oderate spinal stenosis L4-5." (Tr. 250-51.)

Mr. Hreha returned to Dr. Buckner on December 5, 2018. (Tr. 273.) He reported that "aquatherapy [was] really great." (*Id*.) He said it helped for about a day, and the pain was not as bad when it returned. (*Id*.) He reported attending four sessions and said they were planning to add land therapy. (*Id*.) Dr. Buckner reviewed the MRI results and referred him to a surgeon for an opinion. (*Id*.) She continued to prescribe naproxen as needed and advised him to avoid aggravating activities and lifting. (*Id*.)

Mr. Hreha presented to neurosurgeon Mario M. Sertich, M.D. at Neurospinecare, Inc. on February 5, 2019 for an evaluation of his lumbar pain. (Tr. 248.) He reported having back pain for a while, but said it worsened in September/October. (*Id*.) He also reported thigh and leg pain. (*Id*.) He ambulated "without much difficulty," he was able to walk on his heels and toes, his strength was good, his reflexes were "fairly symmetrical," and he had good peripheral pulses.

(Tr. 249.)  He had a mildly positive straight leg raise.  (*Id.*)  Dr. Sertich reviewed the recent MRI findings and stated: "[I]n short [Mr. Hreha] has sciatica on the left side secondary to a herniated disc."  (Tr. 251.)  Dr. Sertich discussed the possibility of microdiscectomy.  (Tr. 251-53.)  Mr. Hreha wanted to think about his options.  (Tr. 251.)

Mr. Hreha returned to Dr. Buckner on February 13, 2019, reporting that the "[s]urgeon said I could fix it or not fix it[,] it just depends on how much it is bothering me really."  (Tr. 276.)  He said water therapy was helping, but he had stopped therapy because he only had a set number of sessions and wanted to make sure he had sessions remaining if he proceeded with surgery.  (*Id.*)  Dr. Buckner performed OMT, reviewed the MRI images, discussed surgical versus non-surgical options, and suggested that Mr. Hreha continue with physical therapy if he opted not to have surgery that year.  (*Id.*)

Mr. Hreha continued treatment with Allied, which included appointments throughout 2019.  (Tr. 521-28, 537-38, 557-58, 573-74, 577-82.)  When Mr. Hreha saw CNP Dahodwala at Allied on February 25, 2019, he reported pain mostly in his left ankle and some mild pain in his left hip.  (Tr. 521.)  He described his pain as aching and throbbing, with daily swelling and worse pain during cold weather and with walking and standing.  (*Id.*)  He said he noticed that his gait had "reverted" to more limping since he stopped therapy.  (*Id.*)  He was taking naproxen with some relief.  (*Id.*)  On examination, he demonstrated tenderness to palpation in the left hip, decreased pulses, slight edema, decreased sensation, and pain with range of motion in the left ankle.  (*Id.*)  His gait was antalgic with a cane.  (*Id.*)

Mr. Hreha returned to Dr. Buckner on March 13, 2019.  (Tr. 278.)  He said he was still stiff and sore, and was not involved in physical therapy at that time.  (*Id.*)  He was looking into laser spine centers, but had not made any calls yet.  (*Id.*)  He reported relief for two days

following his last appointment with Dr. Buckner.  (*Id.*)  Dr. Buckner performed OMT and directed him to follow up as needed in two to four weeks.  (*Id.*)

Mr. Hreha resumed physical therapy in June, continuing through October 2019 (Tr. 529-36, 539-56, 559-72, 575-76).  During his therapy appointments, he demonstrated some tenderness to palpation, some pain with range of motion in the left ankle, and some mild swelling, but his gait and balance were noted to be normal at most sessions.  (Tr. 531-36, 539-56, 559-70.)  He declined to complete all therapy at a June 20, 2019 physical therapy session because he did not want to do therapy for more than an hour.  (Tr. 535.)  The therapist noted that he had demonstrated the ability to complete all therapy without difficulty.  (*Id.*)

During a July 2019 appointment Jennifer Miller MSN, APRN-CNP, Mr. Hreha denied falls but reported losing his balance due to his ankle pain.  (Tr. 537.)  He continued to show decreased range of motion and tenderness to palpation in the left ankle.  (*Id.*)  He was taking over-the-counter analgesics and Flexeril.  (Tr. 538.)  In August 2019, he reported to Sarah Williams MSN, APRN-CNP, that therapy was going well and he was taking Aleve and Flexeril with some relief.  (Tr. 557.)  CNP Williams recommended he proceed with work conditioning and vocational rehabilitation once his current treatment plan was completed.  (Tr. 558.)

Mr. Hreha presented to Cleveland Clinic Rehabilitation and Sports Therapy on December 9, 2019 for a work conditioning physical therapy evaluation.  (Tr. 333.)  Rebecca Linnean, PT, conducted the evaluation.  (*Id.*)  He rated his left ankle pain 7 out of 10 and described his pain as constant, achy, and dull.  (*Id.*)  He reported he was independent with his self-care, cooking, and light cleaning.  (Tr. 334.)  He also reported he could shop, but tried not to lift items out of the cart.  (*Id.*)  He said he needed help lifting the laundry basket up and down the stairs.  (*Id.*)  He also needed help with yardwork because of the lifting required and the uneven surfaces.  (*Id.*)

He reported he could drive for thirty minutes and could stand, walk, or sit for twenty-five to thirty minutes before needing to adjust his position.  (*Id.*)  On examination, PT Linnean noted limited range of motion, swelling, and tenderness in the left ankle.  (Tr. 334-35.)  Mr. Hreha's range of motion in the lower back was also limited.  (Tr. 335-36.)  Occasional tingling and numbness was noted in the left lower leg.  (Tr. 336.)  Left lower extremity strength was grossly 4/5, except the left ankle was 3+/5 for dorsiflexion, 4/5 for plantarflexion, and 4-/5 for inversion and eversion.  (*Id.*)  Right lower extremity strength was grossly 4+/5->5/5.  (*Id.*)  PT Linnean described his gait as: "Patient with decreased toe off noted at terminal stance; slight decreased WS to the Left noted."  (*Id.*)  She described him as "very guarded with activity and apprehensive with movement at this time" and noted that he "demonstrate[d] some self limiting behaviors with lifting and carrying."  (Tr. 337.)  She recommended skilled therapy to improve his strength and functional mobility, but also noted that his prognosis was fair given his "clinical presentation, chronic nature of impairments and limited tolerance to activity."  (*Id.*)

During an examination on December 10, 2019, CNP Miller observed that Mr. Hreha's sensation was within normal limits at all lower spinal segments.  (Tr. 580.)  His Achilles reflexes were normal.  (*Id.*)  Lower extremity motor testing was normal except for a slight decrease (4/5) in the left anterior tibialis.  (*Id.*)  He demonstrated decreased range of motion with pain and stiffness and tenderness to palpation in the left foot, but normal gait and balance.  (Tr. 580-81.)  He continued to take Flexeril and Aleve for pain.  (Tr. 581.)

During a January 21, 2020 appointment with CNP Williams, Mr. Hreha reported that work conditioning was "greatly aggravating his low back" and he might "be taking medical leave to go see" an orthopedic doctor.  (Tr. 584.)  His examination noted reduced range of motion with stiffness, palpation, and mild swelling in the left ankle.  (Tr. 583-84.)  Gait, balance, and

sensation in the lower spinal segments were normal.  (Tr. 583.)  Lower extremity manual motor

testing was normal on the left and right.  (*Id*.)  CNP Williams advised him to continue activity as

tolerated and use of Flexeril and Aleve; she also reviewed use of ice, heat, provocative activities

/ home exercises, and the importance of regular physical activity.  (Tr. 584.)

Mr. Hreha returned to Dr. Buckner on January 23, 2020.  (Tr. 299.)  He complained that

work conditioning was aggravating his back pain.  (Tr. 299.)  He said the movements he was

performing were putting a lot of pressure on his low back and causing a burning sensation on the

left.  (*Id*.)  He also reported that he was very stiff during the day and when he woke up.  (*Id*.) The

back exercises helped for the short-term but then aggravated his back pain.  (*Id*.)  He was using

Aleve up to twice a day and it was hard on his stomach.  (*Id*.)  Dr. Buckner suggested a

consultation with a spinal surgeon regarding his lumbar disc herniations.  (*Id*.)  She noted that he

might "need [a] note to be off from Vocational Rehabilitation for Medical Leave [for] 4 weeks

and reevaluation."  (*Id*.)  She discussed the possibility of a pain management referral for epidural

injections if he decided against surgery.  (Tr. 299-300.)  She performed OMT and she discussed

adding Neurontin, but he declined.  (Tr. 300.)

Mr. Hreha attended a physical therapy appointment with Ms. Linnean on January 23,

2020.  (Tr. 494.)  Ms. Linnean noted that he "demonstrated improvements in activity tolerance

and strength," but he continued to "have high pain complaints in lower back and Left ankle,"

with "[n]o change in overall pain complaints since starting work conditioning."  (*Id*.)  Ms.

Linnean noted: "Patient ambulates on level surfaces with minimal gait deviations on Left- slight

decreased dorsiflexion."  (Tr. 495.)  He could perform a modified squat to lift from the floor.

(*Id*.)  He walked four laps on a track at a "quickened pace," and he went up and down "24 steps

reciprocally to get to track."  (Tr. 496.)  He also carried a twenty-pound bucket on a level surface

for 200 feet and going up and down 24 steps and then switched the bucket to his opposite hand to repeat the sequence.  (*Id*.)  He pushed and pulled thirty pounds on a small sled for 25 feet, completing four reps.  (*Id*.)  Ms. Linnean stated: "[P]atient will continue to benefit from ongoing skilled physical therapy for progression of work conditioning activities."  (Tr. 494.)  However, care was discontinued because Mr. Hreha reported that he spoke with his family physician regarding his lower back pain and he planned to defer further participation in the work conditioning program so he could get treatment for his lower back.  (Tr. 497.)

Dr. Buckner wrote in a letter sent on January 29, 2020 that Mr. Hreha "should be placed on leave from his current vocational rehabilitation program."  (Tr. 673.)  She said he was unable to participate "[d]ue to ongoing medical reasons."  (*Id*.)  The Bureau of Workers Compensation closed his rehabilitation file on February 23, 2020.  (Tr. 671.)

Mr. Hreha returned to Allied on February 25, 2020 with continued complaints of problems with his left ankle.  (Tr. 585.)  On examination, he demonstrated reduced range of motion with stiffness in the left ankle, but his gait and balance were normal.  (Tr. 585-86.)  He reported he was on "medical leave" from work conditioning because it was "greatly aggravating" his low back.  (Tr. 586.)  CNP Williams recommended activity as tolerated.  (*Id*.)

Mr. Hreha presented to Cesar Cereijo, M.D. at the Cleveland Clinic, Department of Orthopedic Surgery on June 19, 2020 for follow up after being seen in the emergency room three days earlier for an injury to his right ankle that occurred when he stepped into a gopher hole.  (Tr. 608.)  X-rays taken in the emergency room showed soft tissue swelling and a possible nondisplaced talar dome fracture.  (Tr. 608, 612, 595.)  He had been wearing a short leg walking boot since his emergency room visit and reported that he had been bearing weight on the ankle.  (Tr. 608.)  Examination of the right lower extremity revealed moderate edema over the medial

10

and lateral ankle with bruising, moderate tenderness to palpation over the posterior lateral ankle, no medial ankle pain, full range of motion, and 5/5 motor strength. (Tr. 609.) An x-ray of the left ankle taken at this visit showed: "[H]ealed bimalleolar ankle fracture with intact hardware with widening of the syndesmosis." (*Id*.) Dr. Cereijo diagnosed right ankle sprain, nondisplaced lateral talar dome fracture versus subacute OCD lesion, and status post left ankle ORIF with persistent pain secondary to likely chronic syndesmotic disruption. (*Id*.) He ordered a CT scan of the left ankle for further evaluation and said Mr. Hreha was "okay for weightbearing as tolerated [on the] right lower extremity and ankle brace." (*Id*.)

A CT scan of the left ankle was performed on July 24, 2020. (Tr. 597-98.) It showed: "Remote post-surgical changes of open reduction internal fixation of the distal fibula and medial malleolus with hardware," "[n]o evidence of hardware failure," "[h]ealed fractures," and "[n]o acute osseous abnormality." (Tr. 598.)

Mr. Hreha returned to Dr. Cereijo on August 21, 2020, continuing to report swelling and pain in his right ankle. (Tr. 702.) Examination of the right ankle revealed edema, swelling, and moderate tenderness to palpation over the posterior lateral ankle, but almost full range of motion with dorsiflexion and plantarflexion and 5/5 strength. (Tr. 703.) Examination of the left ankle revealed edema, swelling, tenderness over the medial malleolus, consistent with the medial screws from his prior surgical procedure, syndesmosis tenderness, and tenderness over the anterior lateral aspect of the ankle with point tenderness. (*Id*.) Dr. Cereijo reviewed the CT scan of the left ankle, and observed that it showed a five-millimeter gap between the fibula and tibia which indicated syndesmosis disruption. (Tr. 703.) He also noted that the hardware appeared to be intact with a healed fracture of the medial malleolus and fibula. (*Id*.) Dr. Cereijo recommended surgical repair and said surgery would have "a high chance of relieving his pain

11

and instability," and "would allow for the possibility to be pain free and be able to return to work in the future." (Tr. 704.) Dr. Cereijo also reviewed an x-ray of the right ankle taken that same day, which showed no acute osseous abnormalities. (Tr. 703, *see also* Tr. 631-32.) Dr. Cereijo diagnosed syndesmosis disruption of the left ankle with persistent pain and instability, status post left open reduction internal fixation of the medial malleolus and fibula, left ankle hardware irritation of the medial malleolus from prior fixation, and right ankle sprain. (Tr. 703.)

### 2. Opinion Evidence

On June 15, 2020, state agency reviewing medical consultant Lynne Torello, M.D. found that Mr. Hreha had the RFC to:

- lift and/or carry twenty pounds occasionally and ten pounds frequently;

- stand and/or walk for a total of four hours and sit for a total of six hours;

- no pushing/ pulling and/or use of foot controls with the left lower extremity;

- never climb ladders, ropes, or scaffolds;

- occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs;

- avoid exposure to unprotected heights, hazards, and dangerous machinery.

(Tr. 83-84.)

On July 20, 2020, state agency medical consultant Rebecca R. Neiger, M.D. affirmed Dr. Torello's RFC findings upon reconsideration. (Tr. 89-91.) Dr. Neiger's review considered Mr. Hreha's right ankle injury which occurred after Dr. Torello conducted her review. (Tr. 88, 91.)

### C. Plaintiff's Pain Questionnaire and Hearing Testimony

### 1. Pain Questionnaire

On April 30, 2020, Mr. Hreha completed a pain questionnaire in connection with his disability claim. (Tr. 212-14.) He reported pain in his left ankle and lower back, described as

dull, sharp, and aching all the time.  (Tr. 212.)  He said it was hard for him to walk, climb stairs,
drive, and do everyday activities due to his pain.  (Tr. 213.)  He reported taking only one
medication, naproxen, which did not relieve his pain.  (*Id*.)  He said other treatments to help
relieve his pain included ice packs, a heating pad, and taking hot showers.  (*Id*.)

### 2.    Hearing Testimony

At the November 23, 2020 hearing, Mr. Hreha testified in response to questioning by the
ALJ and his counsel.  (Tr. 38-59.)   He was living with his wife and their two minor children and
had a driver's license.  (Tr. 38-39.)

Testifying about the problems with his left ankle, Mr. Hreha said he had a lot of therapy
and vocational rehabilitation, but it was "always aching, hurting, sore, [and] swollen."  (Tr. 48.)
He said his therapist could not explain why it was swelling and hurting.  (*Id*.)  He also said that
his left ankle problems started to aggravate his back and he had two herniated discs in his back,
which were causing him sciatic pain.  (*Id*.)  He explained that the original injury was a fracture of
an outer and inner bone in his left ankle that required thirteen screws and a plate on the outside
and a few screws on the inner bone to hold it in place.  (Tr. 49.)  He also reported that the doctor
evaluating him for his more recent right ankle injury discovered that his left ankle had never
healed properly.  (Tr. 48.)  He said:

> the bone [in the left ankle] is out - - twisted outward and causing a - - the bones to
> flex, which is kind of like aggravating the - - the nerves and the hardware and the
> screws that are in there, causing more pain, along with the sciatic nerve pain.

(*Id*.)  He reported that his doctor recommended a fairly involved surgery to try to heal his left
ankle, which would involve six to eight weeks of non-weight bearing post-surgery.  (Tr. 52-53.)

Mr. Hreha also testified about the problems with his right ankle.  (Tr. 53-54.)  He said his
doctor informed him that there was a broken bone in his ankle "floating around" and causing him

pain and swelling.  (*Id*.)  He said his doctor suggested a surgery to correct the problem with his right ankle, but did not want to do that surgery without first fixing the left ankle.  (Tr. 54.)

With respect to his back problems, Mr. Hreha testified that he had two herniated discs in the lower back that were pressing against his sciatic nerve.  (Tr. 54-55.)  He said his doctors recommended back surgery, but noted that there was a wait due to Covid because it was an elective surgery, and that his doctors were not sure it was the best plan to pursue back surgery before correcting the left ankle.  (Tr. 55.)

Mr. Hreha estimated he could walk 400 feet with a cane before he would need a break because of problems with his ankles and back.  (Tr. 49.)  He said he always used his cane when walking on wet, rainy, or icy surfaces, and when walking long distances.  (Tr. 50.)  He could walk shorter distances on dry surfaces without use of his cane.  (*Id*.)  He recalled being prescribed the cane after his original surgery, once he stopped using crutches.  (*Id*.)  He estimated he could stand in one place for fifteen minutes if he had a cane or something near him like a table to assist him.  (Tr. 50-51.)  He estimated he could sit for fifteen minutes before he had "to stand up because of the weight of sitting on [his] lower back" and his "legs going numb." (Tr. 57.)  He estimated he could lift twenty-five pounds, but slowly.  (Tr. 52.)

Mr. Hreha said he tried to keep his feet elevated as much as he could to help with the swelling.  (Tr. 51.)  He also said he wore compression braces on both ankles.  (*Id*.)  He estimated that he elevated his feet for six hours every day.  (*Id*.)  He also reported that he iced his ankles because it helped reduce the swelling and soothed his pain.  (*Id*.)  He said he used Biofreeze to help with the nerve pain and took Aleve and prescription naproxen to help with the inflammation, but he also noted that the medication caused him stomach problems.  (Tr. 56.)  He reported that he made minimal progress with physical therapy and vocational rehabilitation,

saying that any progress he made could be undone if he moved the wrong way or overexerted himself.  (Tr. 56-57.)

He reported problems sleeping due to leg cramping and back pain.  (Tr. 58.)  He was able to take care of his personal hygiene and dress himself, but needed assistance with putting on socks and tying his shoes.  (*Id*.)  He said he was able to do very little as far as housework, his wife did all the shopping, and he generally left the house only to attend doctor appointments. (Tr. 58-59.)  He usually filled his day with sitting at home and watching the news.  (Tr. 59.)

**D.    Vocational Expert's Testimony**

A Vocational Expert ("VE") testified at the hearing.  (Tr. 59-64.)  The VE classified Mr. Hreha's past work as follows: CDL driver, chemical processing laborer, and forklift operator, all semi-skilled, medium jobs per the DOT, and very heavy as performed.  (Tr. 61.)  The ALJ asked the VE whether Mr. Hreha's past work or any other jobs would be available for an individual of the same age and with the same education and work experience as Mr. Hreha with the ability to perform the full range of sedentary work, subject to the following limitations:

> specifically, the individual would be limited to occasional use of foot controls, bilaterally, the individual being limited to occasional climbing of ramps or stairs, but would never climb ladders, ropes, or scaffolds, and the individual would require a cane for all ambulation, the individual would be limited to occasional balancing, stooping, kneeling, crouching, or crawling, individual would never be exposed to unprotected heights or hazardous machinery.

(Tr. 62.)  The VE testified that the described individual could not perform Mr. Hreha's past work, but that there would be sedentary exertional jobs available in the national economy, including document specialist, surveillance system monitor, and addresser.  (*Id*.)

The ALJ next asked the VE whether there would be jobs available to an individual with the limitations set forth in the first hypothetical who would also need to elevate his feet to waist level for two hours out of the workday.  (Tr. 62-63.)  The VE stated that there would be no work

15

available for an individual with those limitations.  (Tr. 63.)  The VE also testified regarding tolerances for time off-task and absenteeism, stating that most employers tolerate an employee being off-task up to and including 10% of the workday and having no more than one unscheduled absence per month.  (*Id*.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if

the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy. *Id.*

## IV.     The ALJ's Decision

In his January 13, 2021, decision, the ALJ made the following findings:[2]

1.      The claimant meets the insured status requirements of the Social Security Act through September 30, 2021. This finding departs from that of the previous decision, in order to reflect additional "quarters of coverage" credited to the claimant on his work history. (Tr. 15-16.)

2.      The claimant has not engaged in substantial gainful activity since June 9, 2015, the alleged onset date. (Tr. 16.) This finding adheres to that of the previous decision. (*Id.*)

3.      The claimant has the following severe impairments: obesity, left ankle fracture, right ankle fracture, thrombophlebitis of the lower left extremity, and lumbar degenerative disc disease with stenosis. (*Id.*) This finding departs from that of the previous decision, in order to account for the impairments documented in the current evidence. (*Id.*)

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments. (Tr. 16-17.) This finding adheres to that of the previous decision. (*Id.*)

5.      The claimant has the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) except: he must be afforded a cane for all periods of ambulation; he may occasionally operate foot controls with the bilateral

---

[2] The ALJ's findings are summarized.

lower extremities; he may occasionally balance, stoop, kneel, crouch, crawl, climb ramps and stairs, but may never climb ladders, ropes or scaffolds; he must avoid all exposure to unprotected heights and hazardous machinery. (Tr. 17-22.) This finding departs from that of the previous decision, in order to accommodate the present state of his impairments, as documented in the current evidence. (Tr. 17.)

6.  The claimant is unable to perform any past relevant work. (Tr. 22.) This finding adheres to that of the previous decision. (*Id*.)

7.  The claimant was born in 1983 and was 32 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. (*Id*.) This finding adheres to that of the prior decision. (*Id*.)

8.  The claimant has at least a high school education. (*Id*.) This finding adheres to that of the previous decision. (*Id*.)

9.  Transferability of job skills is not material to the determination of disability. (Tr. 23.) This finding departs from that of the previous decision, a necessary consequence of the residual functional capacity assigned. (*Id*.)

10. Considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform. (Tr. 23-24.) This finding adheres to that of the pervious decision. (Tr. 23.)

Based on the foregoing, the ALJ determined that Mr. Hreha had not been under a disability from June 9, 2015 through the date of the decision, stating that his finding departed from that of the previous decision, for the period concluding July 22, 2016, and adhered to the previous decision, for the period thereafter. (Tr. 24.)

## V.  Plaintiff's Arguments

Mr. Hreha presents the following three arguments: (1) the ALJ erred in failing to evaluate his left ankle impairment under Listing 1.03 (ECF Doc. 6, pp. 1, 9-12); (2) the ALJ erred by failing to incorporate his need to elevate his legs into his residual functional capacity (*id.* at pp. 1, 12-13); and (3) the ALJ failed to properly analyze his pain (*id.* at pp. 1, 13-16).

## VI.    Law & Analysis

**A.    Standard of Review**

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the

Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.    First Assignment of Error: Whether ALJ Erred by Failing to Evaluate Mr. Hreha's Left Ankle Impairment Under Listing 1.03**

In his first assignment of error, Mr. Hreha argues the ALJ erred by not specifically evaluating his left ankle impairment under Listing 1.03 and by finding he could effectively ambulate. (ECF Doc. 6, pp. 9-12.) The Commissioner acknowledges that the ALJ did not specifically discuss Listing 1.03, but argues remand is not warranted because the ALJ considered a similar listing (Listing 1.02) which also required evidence of an inability to ambulate effectively, and appropriately determined that Mr. Hreha could not meet that standard. (ECF Doc. 9, p. 14.) The Commissioner also argues that Mr. Hreha has failed to carry his burden to present specific evidence to demonstrate that his impairment satisfied all the criteria under Listing 1.03, including a showing that he could not ambulate effectively. (*Id.*)

At Step Three of the disability evaluation process, a claimant will be found disabled if his impairment meets or equals one of the listings in the Listing of Impairments. *See* 20 C.F.R. §

20

404.1520(a)(4)(iii). The claimant bears the burden of establishing that his condition meets or equals a listing. *See Johnson v. Colvin*, No. 1:13CV-00134, 2014 WL 1418142, at *3 (W.D. Ky. Apr. 14, 2014) (citing 20 C.F.R. §§ 404.1520(d), 416.920(d); *Buress v. Sec'y of Health and Human Serv's.*, 835 F.2d 139, 140 (6th Cir. 1987)). To do so, a claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 728 (6th Cir. 2004).

The Sixth Circuit has explained that "neither the listings nor the Sixth Circuit require the ALJ to 'address every listing' or 'to discuss listings that the applicant clearly does not meet.'" *Smith-Johnson v. Comm'r of Soc. Sec.,* 579 F. App'x 426, 432 (6th Cir. 2014) (quoting *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 641 (6th Cir. 2013)). An "ALJ should discuss the relevant listing, however, where the record raises 'a substantial question as to whether [the claimant] could qualify as disabled' under a listing." *Smith-Johnson*, 579 F. App'x at 432 (citing *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990)). To raise a "substantial question," the Court explained "[a] claimant must do more than point to evidence on which the ALJ could have based his finding." *Id*. (citing *Sheeks*, 544 F. App'x at 641–42). "[T]he claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing." *Id*. "Absent such evidence," the Sixth Circuit found that an ALJ "does not commit reversible error by failing to evaluate a listing at Step Three." *Id*. at 433.

Listing 1.03 relates to surgical reconstruction of a weight-bearing joint. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.03 (effective May 21, 2020 to April 1, 2021). At the time of the ALJ's decision, Listing 1.03 was defined as follows:

> Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset.

*See id.* As defined in 1.00B2b, "inability to ambulate effectively" means:

> an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2b(1).

The Listing also defines what it means for an individual to "to ambulate effectively," stating:

> To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

*Id*. at § 1.00B2b(2).

In this case, the ALJ found Mr. Hreha did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1, observing that "[n]o treating or examining physician has indicated findings that would satisfy the severity of the requirements of any listed impairment." (Tr. 16.)   In making this finding, the ALJ explained that "[a]ll of the listings were considered in

reaching this finding, with specific emphasis on listings 1.02, 1.04, and 4.11." (*Id* (emphasis added).)  He stated:

> Relevant to listing 1.02, diagnostic scanning (B6F/4) and radiographic studies (B8F/5), of the left ankle, does not report the "gross anatomical deformity" contemplated by the listing. Radiographic studies of the right ankle (B6F/1), (B8F/5), do not indicate the "gross anatomical deformity" contemplated by the listing. <u>Clinical studies throughout much of the record</u> (B1F/2), (B5F/27, 37, 45, 55, 67, 71, 74, 77, 79) <u>describe an essentially normal gait, such that the evidence does not indicate that the claimant is unable to ambulate effectively</u>.

(Tr. 16 (emphasis added).)

Mr. Hreha contends that remand is required because the ALJ looked at whether there was an anatomical deformity under Listing 1.02 rather than whether a surgical reconstruction healed properly under Listing 1.03.  (ECF Doc. 6, pp. 9-10.)  He acknowledges that the ALJ addressed one of the criteria of Listing 1.03 — effective ambulation — when he analyzed Listing 1.02.  (ECF Doc. 6, p. 10.)  Setting aside the question of whether Mr. Hreha's prior open reduction internal fixation surgery was a "reconstruction surgery or surgical arthrodesis" as contemplated in Listing 1.03, the Court finds no error resulting from the ALJ's lack of specific citation to that Listing given his well-supported finding that "the evidence does not indicate the claimant is unable to ambulate effectively."  (Tr. 16.)

Mr. Hreha contends that the ALJ erred when he found the evidence did not demonstrate an inability to ambulate effectively because he "minimize[d] the requirements of the listing (1.00B2b's definition of effective ambulation) and only point[ed] to gait issues."  (ECF Doc. 6, p. 10.)  He asserts that the Listing "contemplate[s] a more thorough definition of effective ambulation" and is not limited only to whether assistive devices are required for ambulation, and "the ALJ failed to address any [other] . . . criteria in his cursory dismissal of the extensive surgical history of [his] left ankle."  (*Id*.)

While Listing 1.00B2b(2) provides examples of ineffective ambulation, including "the inability to walk a block at a reasonable pace on rough or uneven surfaces," an "inability to ambulate effectively" is specifically defined as "an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2b(1). Given this definition, the Court finds that the ALJ appropriately relied on evidence showing no issues with gait when assessing whether the evidence showed Mr. Hreha was unable to "ambulate effectively." (Tr. 16.)

"Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2b(1) (emphasis added). It is not disputed that Mr. Hreha uses a cane for ambulation. Indeed, the ALJ included in the RFC a limitation that he "be afforded a cane for all periods of ambulation." (Tr. 17.) But Mr. Hreha points to no evidence demonstrating that his use of a single cane limits the functioning of both of his upper extremities. *See e.g.*, *Elliott v. Comm'r of Soc. Sec.*, No. 5:17 CV 2140, 2019 WL 400537, at *10 (N.D. Ohio Jan. 31, 2019) (explaining that "the use of a single cane or some gait abnormality is alone insufficient to establish ineffective ambulation"). Based on the foregoing, the Court finds no indication that the ALJ minimized the requirements of 1.00B2b.

Finally, Mr. Hreha argues that the "ALJ's [Step Three] analysis lacks the required 'explained conclusion' necessary to satisfy judicial review," and that the evidence supports a finding that his impairment satisfied Listing 1.03. (*Id*. at pp. 10-11.) The ALJ's explanation is not lacking. He clearly explained that he found the evidence did not demonstrate an inability to

ambulate effectively. (Tr. 16.) The records cited by the ALJ in support of this finding included the following physical examination findings: ability to ambulate without much difficulty (Tr. 249), ability to walk on heels and toes (*id.*), good strength (*id.*), tenderness to palpation in the left ankle but normal gait and balance (Tr. 533), normal gait and balance (Tr. 543, 551, 561), intact sensation in lower spinal segments (Tr. 573, 577, 580, 583), normal deep tendon reflexes (*id.*), normal gait and balance (Tr. 573, 583, 585), and normal manual motor testing (*id.*), normal manual motor testing with the exception of 4/5 in the left anterior tibialis, but normal gait and balance (Tr. 577, 580). The ALJ also detailed evidence regarding the left ankle impairment and explained that the evidence did not support a finding that the impairment would preclude all work. (Tr. 19-20.) More particularly, the ALJ explained:

> In terms of the claimant's alleged left ankle fracture, this impairment was identified as severe within the previous decision (B1A), and diagnostic scanning of the left ankle, dated July 24, 2020, indicated remote surgical changes, indicative of open reduction-internal fixation surgery, with healed fractures, no observable hardware failure, and no other acute osseous abnormality (B6F/4). Radiographic study of the left ankle, dated August 21, 2020, added the observation of a calcaneal enthesophyte, but otherwise unchanged findings, with no fracture, dislocation or malalignment (B8F/5). The claimant received a new diagnosis of syndesmosis disruption of the left ankle, on August 21, 2020 (B13F/2), for which fixation surgery is now proposed (B13F/3). While this history and the present findings would be consistent with the claimant's allegations of chronic left ankle pain, the record, when considered as a whole, is not supportive of the contention that the existence of this impairment would be preclusive of all types of work.
>
> The claimant has been involved in extensive physical therapy for this impairment. He has demonstrated considerable success with this form of treatment. He described beneficial effects of aquatherapy in 2018 (B2F/9, 12), but stopped the treatment in February 2019 (B2F/12). In twelve sessions of physical therapy, culminating in August 2019, he had met all treatment goals and all objective measures fell within normal limits (B5F/47). He attended 19 sessions of work conditioning therapy between December 9, 2019 and January 23, 2020, and was making progress, or had met, all treatment goals (B4F/165), when he terminated treatment to seek the adjournment described previously (B11F/3).
>
> The claimant described brief use of a muscle relaxant and non-steroidal anti-inflammatory medication in treatment for this impairment (B5E/4), but this was

soon reduced to the non- steroidal anti-inflammatory only (B5E/2), (B7F/7), which use continues (B13F/1), despite the claimant's reports of constipation (B5E/2) and a want of efficacy (B5E/2).

The claimant has conceded the temporary relief from symptoms from non-medicinal palliatives, including heating pads, ice and hot showers (B5E/1). Clinical examinations included in the record have consistently, albeit not universally, reported either mildly adverse, or benign findings, including one dated April 16, 2018, which indicated tenderness of the lateral and medial malleolus, with reduced range of motion and an antalgic gait, favoring the left foot (B5F/3), one dated August 15, 2019, which indicated normal strength against maximal resistance, normal active range of motion in all planes [with subjective complaints of pain], normal gait and balance, and no edema (B5F/47), or one dated August 21, 2020, which indicated edema and swelling of the medial malleolus, tenderness of the medial malleolus, tenderness of the syndemosis, and with a hypermobile fibula, but with normal strength and sensation intact to light touch in the L3 through S1 dermatomes (B13F/2).

(Tr. 19-20.)  The ALJ's discussion of the medical evidence adequately supports his decision.

Moreover, Mr. Hreha has failed to identify sufficient evidence to show he could reasonably meet or equal every requirement of Listing 1.03.  Mr. Hreha points to objective evidence that the ALJ considered, his own subjective complaints, and one instance of an impaired gait on a level surface and stairs.  (ECF Doc. 6, p. 11.)  The ALJ acknowledged that Mr. Hreha had an antalgic gait at times (Tr. 20 (citing Tr. 509)) and the Court finds the objective medical evidence highlighted by the ALJ in his Step Three (Tr. 16) and Step Four analyses (Tr. 19-20) do not support a finding that Mr. Hreha suffered "an extreme limitation of the ability to walk" as required to meet Listing 1.03.

For the reasons set forth above, the Court finds that the ALJ reasonably explained why Mr. Hreha's left ankle impairment did not meet a listing at Step Three, that the ALJ's finding that "the evidence does not indicate that the claimant is unable to ambulate effectively" (Tr. 16) was supported by substantial evidence, and that Mr. Hreha has not identified specific record evidence showing that he could have reasonably met or equaled every element of Listing 1.03.

26

Accordingly, the Court finds the ALJ's failure to specifically discuss Listing 1.03 does not support remand and the first assignment of error is without merit.

**C.      Second Assignment of Error: Whether ALJ Erred by Not Including a Need to Elevate Legs in the RFC**

In his second assignment of error, Mr. Hreha argues that the ALJ erred because he did not include an RFC limitation requiring him to elevate his legs.  (ECF Doc. 6, pp. 12-13.)  The Commissioner argues that Mr. Hreha has failed to establish the need for additional RFC restrictions beyond those included by the ALJ.  (ECF Doc. 9, pp. 15-17.)

A claimant's "residual functional capacity is the most [he] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1).  "The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician."  *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (citing See 20 C.F.R. §§ 404.1546(c), 416.946(c)).  An ALJ assesses a claimant's "residual functional capacity based on all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(1).  "[A]n ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding."  *Poe*, 342 F. App'x at 157.

In arguing that the evidence supports an RFC limitation to allow for elevation of his legs, Mr. Hreha cites to: objective medical findings documenting injury to his ankles and herniated discs, with trapping his L5 nerve root and sciatica; and examination findings showing decreased range of motion in the ankles and spine, tenderness in the ankles and left hip, decreased strength and sensation in the lower extremities and ankles, edema and swelling in the ankles, positive straight leg raise on the left, and antalgic gait.  (ECF Doc. 6, p. 12.)  He also argues that he testified to elevating his legs for six hours each day and using ice and compression braces on his ankles to help with swelling.  (*Id*. at pp. 12-13.)

27

As a threshold matter, the Court notes the ALJ was not "required to discuss each piece of data in [his] opinion, so long as [he] consider[ed] the evidence as a whole and reach[ed] a reasoned conclusion." *Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507–08 (6th Cir. 2006) (per curiam)). Additionally, the burden of proof at Steps One through Four rests with the claimant, and "it is not unfair to require a [him] to prove the extent of his impairments." *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

Here, the ALJ did not ignore evidence regarding Mr. Hreha's ankle or lumbar injuries. Indeed, the ALJ found severe impairments of left ankle fracture, right ankle fracture, thrombophlebitis of the lower left extremity, and lumbar degenerative disc disease with stenosis. (Tr. 16.) The ALJ also detailed medical evidence regarding each of these severe impairments. (Tr. 18-20.) He acknowledged evidence of swelling, edema, and tenderness in the ankles and an antalgic gait at times. (Tr. 20.) He acknowledged evidence of a positive straight leg raise. (Tr. 18.) The ALJ also acknowledged that palliative measures included use of ice. (*Id*.) Considering the entirety of the record, the ALJ concluded that Mr. Hreha had the RFC to perform sedentary work with the following additional limitations:

> Claimant must be afforded a cane for all periods of ambulation; the claimant may occasionally operate foot controls with the bilateral lower extremities; the claimant may occasionally balance, stoop, kneel, crouch, crawl, climb ramps and stairs, but may never climb ladders, ropes or scaffolds; the claimant must avoid all exposure to unprotected heights and hazardous machinery.

(Tr. 17.) While Mr. Hreha argues that the evidence supports a more restrictive RFC, it is not this Court's role to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at 387. The only evidence in the administrative record that is offered to support the asserted need to elevate his legs is Mr. Hreha's own testimony that it was

28

his practice to elevate his legs six hours a day to help with swelling.  (Tr. 51.)  There is no medical opinion indicating that Mr. Hreha was required to elevate his legs (Tr. 83-84, 89-91), and the ALJ was not required to "accept [Mr. Hreha's] subjective complaints." *Jones*, 336 F.3d at 476.  The ALJ considered the medical opinions and found them partially persuasive because they were partially consistent with and supported by the overall evidence of record.  (Tr. 21-22.)

For the reasons set forth above, and the Court finds Mr. Hreha has not met his burden to show that the RFC – which did not require elevation of his legs during the workday – lacked the support of substantial evidence.  Accordingly, the second assignment of error is without merit.

**D.     Third Assignment of Error: Whether ALJ Properly Considered Subjective Symptoms**

In his third assignment of error, Mr. Hreha argues the sedentary RFC is not supported by substantial evidence because the ALJ did not properly evaluate his allegations of pain.  (ECF Doc. 6, pp. 13-16.)  He contends that the ALJ's analysis was boilerplate and the ALJ improperly cherry-picked the record when evaluating his allegations of pain.  (ECF Doc. 6, pp. 13-16.)  The Commissioner argues that the ALJ's symptom analysis is not merely boilerplate and that the ALJ's determination that Mr. Hreha's subjective allegations of pain were not fully consistent with the record is supported by substantial evidence.  (ECF Doc. 9, pp. 17-20.)

Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable impairment that could reasonably be expected to produce the claimant's symptoms.  *See* SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a))*.*  If that requirement is met, the second step is to evaluate of the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities.  *See* SSR 16-3p, 82 Fed Reg. 49462,

49463; *Rogers,* 486 F.3d at 247.  There is no dispute that the first step is met in this case (Tr. 21), so the discussion will be focused on the ALJ's compliance with the second step.

When the alleged symptom is pain, an ALJ should evaluate the severity of the alleged pain in light of all relevant evidence, including the factors set out in 20 C.F.R. § 404.1529(c). *See Felisky v. Bowen*, 35 F.3d 1027, 1038–39 (6th Cir. 1994).  Factors relevant to a claimant's symptoms include daily activities, types and effectiveness of medications, treatment received to address symptoms, and other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms.  *See* SSR 16-3p, 82 Fed. Reg. 49462, 49465-49466; 20 C.F.R. 404.1529(c)(3).

Mr. Hreha contends the ALJ's evaluation of his subjective allegations was boilerplate and too vague to allow for judicial review.  (ECF Doc. 6, pp. 14-15.)  He contends that the ALJ improperly cherry-picked evidence, arguing that "by parsing through the record and selectively relying upon evidence with minimal objective findings, the ALJ minimize[d] Plaintiff's reality and disregards pain's impact upon sustainability."  (*Id.*)  He asserts that, "[i]n finding Mr. Hreha capable of all the requirements of sedentary work, the ALJ may have purported to include[] the consideration of pain into his residual functional capacity assessment, but missed the mark on evaluating sustainability."  (*Id*. at p. 16.)

Of course, an ALJ may not cherry pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding. *See, e.g., Gentry v. Comm'r*, 741 F.3d 708, 724 (6th Cir. 2014); *Minor v. Comm'r*, 513 F. App'x 417, 435 (6th Cir. 2013).  However, "an ALJ does not 'cherry pick' the evidence merely by resolving some inconsistencies unfavorably to a claimant's position." *Solembrino v. Astrue*, No. 1:10–cv–1017, 2011 WL 2115872, at *8 (N.D. Ohio May 27, 2011).  Indeed, the Sixth Circuit has explained that allegations of cherry-

picking evidence by the ALJ are "seldom successful because crediting it would require a court to re-weigh record evidence." *DeLong v. Comm'r of Soc. Sec. Admin.*, 748 F.3d 723, 726 (6th Cir. 2014) (citing *White v. Comm'r of Soc. Sec.,* 572 F.3d 272, 284 (6th Cir. 2009)).

Here, a review of the decision reveals that the ALJ considered the entire record, based his findings on multiple relevant factors, and provided "specific reasons for the weight given to the individual's symptoms," SSR 16-3p, 82 Fed Reg. 49462, 49467.  The analysis is not mere boilerplate.  The ALJ acknowledged that Mr. Hreha had severe impairments relating to his ankles, left lower extremity, and lumbar spine (Tr. 16), but concluded that his "statements concerning the intensity, persistence and limiting effects of [the] symptoms [caused by his severe impairments] [were] not entirely consistent with the medical evidence and other evidence in the record" (Tr. 21).

In support of this finding, the ALJ considered objective medical evidence regarding each of the impairments, which included diagnostic imagery, examination findings, and a proposed surgery for a new diagnosis of syndesmosis disruption of the left ankle.  (Tr. 18-20.)  He also considered evidence regarding treatment modalities, which included physical therapy, work conditioning therapy, osteopathic manipulative therapy, use of compression stockings, brief use of a muscle relaxant, and use of non-steroidal anti-inflammatory medication and non-medicinal palliatives such as heating pads, ice, and hot showers.  (Tr. 18-20.)  Following his thorough discussion of the medical evidence, he concluded: "In sum, the evidence would indicate that the symptom limitations relevant to these impairments are not as severe as alleged."  (Tr. 20.)

The ALJ also considered evidence regarding Mr. Hreha's reported daily activities.  (Tr. 21.)  More specifically, he stated:

> At one point or another in the record (either in forms completed in connection with the application and appeal, in medical reports or records, or in the claimant's

testimony), the claimant has reported the following daily activities: the claimant is independent with personal care, cooking and light cleaning. He is able to shop and drive in thirty-minute increments (B4F/2). In short, the claimant has described daily activities, which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. While none of these activities, considered in isolation, would warrant a finding of "not disabled"; when considered in combination, they strongly suggest that the claimant would be capable of engaging in the work activity contemplated by the residual functional capacity.

(Tr. 21 (emphasis added).)  The ALJ proceeded to further explain his evaluation of Mr. Hreha's

subjective allegations pursuant to SSR 16-3p, explaining:

> The following observations, recorded pursuant to Social Security Ruling 16-3p, have also informed the conclusions announced in this decision. The claimant has been reported as engaging in guarding and self-limiting behaviors in treatment (B11F/10). The claimant described unchanged ankle pain, despite having met all physical therapy, and registering normal results in all objective measures (B15F/47). The claimant, making progress toward, or having met, all treatment goals in a work-conditioning program (B4F/165), sought treatment for his low back for the first time in nine months (B2F/35), in order to secure an adjournment from the work-conditioning program. Once this adjournment was secured (B11F/3), the claimant did not return, and has not returned, for further treatment of his back.

(*Id*. (emphasis added).)  The ALJ additionally considered the opinions of the state agency

medical consultants who opined that Mr. Hreha had the RFC to perform light work with certain

limitations designed to account for his impairments.  (Tr. 21-22, 83-84, 89-91.)

The ALJ found the state agency opinions partially persuasive (Tr. 21-22), but found Mr.

Hreha's "newer diagnosis of syndesmosis, reported after the rendering of [these] opinions, [was]

suggestive of further exertional restrictions, to 'true' sedentary work, from the 'effective'

sedentary work posited by these doctors" (Tr. 22).  The ALJ also found that the record supported

additional limitations to account for his use of a cane and his more recent right ankle impairment.

(*Id*.)  Mr. Hreha provides no medical opinion articulating a need for limitations beyond those

included in the RFC.  Indeed, the only medical opinions of record are those of the state agency

medical consultants.  (Tr. 22 ("No other treating or examining physician or other medical health provider rendered an opinion relevant to the formulation of the residual functional capacity.").)

The Court finds that the ALJ sufficiently explained his reasons for finding Mr. Hreha's allegations of pain not as limiting as he alleged.  The ALJ was not required to "accept [his] subjective complaints." *Jones*, 336 F.3d at 476.  The ALJ weighed the entirety of the evidence and credited Mr. Hreha's allegations of pain to the extent he found them supported by the record.  While Mr. Hreha argues that the evidence supports a finding that his pain was more limiting than the ALJ found it be, it is not this Court's role to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387.

For the reasons stated, the Court finds that the ALJ adequately considered Mr. Hreha's subjective allegations in the context of the record as a whole and made a decision supported by substantial evidence, including the addition of certain functional limitations beyond those contained in the only opinions of record.  (Tr. 22.)  Mr. Hreha has not met his burden to demonstrate that the ALJ erred in considering her subjective complaints of pain, and the ALJ adequately explained his reasons for finding the subjective complaints were not entirely consistent with other evidence in the record.  The third assignment of error is without merit.

### VII.   Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's decision

September 30, 2023                            /s/ Amanda M. Knapp
                                             _____
                                             AMANDA M. KNAPP
                                             UNITED STATES MAGISTRATE JUDGE